IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | |
|---|---|
| BRANDON ARMSTRONG, individually, and on behalf of all others similarly situated, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| NATIONAL ASSOCIATION OF MUSIC, MERCHANTS INC.; GUITAR CENTER, INC.; and GUITAR CENTER STORES, INC.; | ) ) ) ) ) |
| Defendants. | ) ) ) |

## CLASS ACTION COMPLAINT

Plaintiff, Brandon Armstrong, for his Class Action Complaint against Defendants, upon personal knowledge as to facts pertaining to himself and upon information and belief as to all other matters, states as follows:

## NATURE OF ACTION

1.     Plaintiff, a consumer and a direct purchaser of a guitar from one of the defendants herein, brings this action on his own behalf and on behalf of a class of purchasers of fretted musical instrument products such as acoustic and electric guitars, violins, amplifiers, and strings ("Fretted Instrument Products") between January 1, 1999, and December 31, 2007.

2.     In March, 2009, the Federal Trade Commission ("FTC") issued a cease and desist order to the National Association of Music Merchandising

("NAMM") and at the same time settled the FTC's charges that NAMM had "permitted and encouraged" acts constituting violations of Section 5 of the FTC Act among its members and that the acts and practices of NAMM "constitute unfair methods of competition in or affecting commerce in violation of Section 5 of the Federal Trade Commission Act, as amended 15 U.S.C. § 45."  The FTC also alleged that absent appropriate relief "such acts and practices, or the effects thereof will continue to recur. . ."

3.     Specifically, the FTC, after an investigation, alleged that between 2005 and 2007, NAMM organized various meetings and programs for its members, such as defendants herein, at which competing retailers of musical instruments were permitted and encouraged to exchange competitively sensitive information, strategies for implementing minimum advertised pricing, and restrictions of retail price competition.

4.     The FTC alleged that the "challenged conduct served no legitimate business purpose and resulted in no significant efficiency benefits."

5.     According to the FTC's press release announcing NAMM's settlement of "FTC Charges of Illegally Restraining Competitions", "the FTC's proposed consent order is designed to remedy NAMM's anti-competitive conduct."  The Commission's vote to accept the complaint and the consent order was 4-0.

6.      In the competition-restrained market created by defendants' conduct, plaintiff and the Class purchased fretted Instrument Products at artificially inflated prices.

7.      NAMM's conduct, and that of other defendants named herein, all of whom are members of NAMM, are *per se* illegal under Section 1 of the Sherman Act.  The conduct of defendants, and each of them, unreasonably restrained trade in the relevant market(s) (defined below), causing substantial anti-competitive effects and inflated prices to consumers.

8.      The conduct and scheme was specifically intended to protect NAMM members from price competition by either securing higher price levels, and thereby, restricting retail price competition, or by eliminating price discounting entirely.

9.      Absent defendants' anti-competitive conduct, plaintiff and the other Class members would have paid lower prices for the Fretted Instrument Products they purchased during the Class Period.  Plaintiff seeks damages and equitable relief under Sections 1 and 2 of the Sherman Antitrust Act.

## JURISDICTION AND VENUE

10.     The Court has jurisdiction over the claims relating to violations of the Sherman Antitrust Act of 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. § 15.  Jurisdiction is also proper under 28 U.S.C. § 1332(d)(2).

11.     Venue is proper in this judicial district under 15 U.S.C. § 22 and 28 U.S.C. § 1391.  Defendant, Guitar Center, transacts business within this district

and many of the acts and events giving rise to this action occurred within this district.

## **PARTIES**

12.    Plaintiff, Bryan Roach, is a resident of the State of Missouri.  In the class certification period, Plaintiff purchased fretted instrument products from the Defendant, Guitar Center.

13.    Defendant, National Association of Music Merchants, Inc. ("NAMM"), is a New York corporation with its principal place of business located at 5790 Armada Drive, Carlsbad, California 92008.

14.    NAMM is a trade association comprised of more than 9,000 members, including defendants, that include manufacturers, distributors, and dealers of musical instruments and related products.   Most United States manufacturers, distributors, and dealers of musical instruments are members of NAMM.  NAMM is controlled by its members, including defendants herein.

15.    Defendant, Guitar Center, Inc. ("Guitar Center"), is a Delaware corporation with its principal place of business at 5795 Lindero Canyon Road, Westlake Village, California, and is a retail seller of Fretted Instrument Products. Guitar Center is a member of NAMM.

16.    Defendant, Guitar Center, maintains twenty-one (21) stores in Texas, more than in any other state; maintains a substantial portion of those Texas stores within the Eastern District of Texas; and maintains nearly double the number of stores within Texas than in the next largest states (12 in Florida and Illinois).

17.     Plaintiff is informed and believes and thereon alleges that as to all transactions relevant herein, each defendant was an agent of one or more defendants named herein, and as such, was acting within the purpose, course, and scope of such agency.   Plaintiff is further informed and believes that each defendant aided and abetted, and acted in concert with, and/or conspired with, each and every defendant to commit the acts complained of herein and to engage in a course of conduct in the business practices complained of herein.

18.     Various individuals, partnerships, corporations, and associations not named as defendants in this Complaint have participated as co-conspirators in the violations of law alleged herein, and have performed acts and made statements in furtherance thereof.  The identity of all co-conspirators is unknown at this time and will require discovery.

## TRADE AND COMMERCE

19.     Defendants are involved in interstate trade and commerce, and the activities of defendants as alleged in this action have substantially and adversely affect interstate commerce.  In the conduct of their business, defendants directly or indirectly, has used and uses the means and instrumentalities of interstate commerce in furtherance of the acts and communications alleged herein, including, but not limited to, the United States postal system, the nationwide system, through and by means of which a substantial amount of the nation's communications, information exchanges, and transportation take place.

## SUBSTANTIVE ALLEGATIONS

**A.    The Fretted Instrument Product Market is Part of the Larger Musical Instrument Market Dominated by Defendants**

20.    According to data maintained by The Music Trades - the only industry trade publication - in the past six years, the ten largest music product suppliers have increased their market share from approximately 42% to 50% in 2008.

21.    "Music product" companies are generally understood to include companies which manufacture, supply, or sell at retail musical instruments, accessories, and products from amplifying and recording music.

22.    According to The Music Trades, there are distinct product categories within the music product markets, including the fretted instrument product category, (consisting of acoustic and electric guitars, instrument amplifiers, and strings), and pianos, consisting of acoustic and digital pianos, percussion products consisting of drums, cymbals, and mallets.  Within the Fretted Instrument Product market, guitars are by far the most popular music instruments.

23.    In 2008, the Fretted Instruments Product category retail dollar sales volume was $1.55 billion of an approximately $7 billion dollar per year music instrument market.

24.    According to a national Gallop poll commissioned by NAMM (and conducted regularly since 1978), specialized music retail stores, such as those operated by defendants, remain the consumer's first choice for buying music

products.  57% of poll respondents preferred to purchase at specialized music stores versus 23% who express a preference for internet purchases and only 15% expressing a preference for mass market retailers such as Best Buy, Costco, Wal-Mart, or Toys-R-Us.  The mass market retailers' stock mainly lower-end guitars in the $250 or less range.

25.    The guitar and accessories product market is recognized as a distinct product market in the industry and has its own trade association, the Guitar and Accessories Marketing Association ("GAMA").

26.    Published figures from NAMM and The Music Trades reports that from 1998 to 2007, acoustic guitar sales grew to 1.35 million units from 611,000; and sales of electric guitars grew from 543,000 to 1.5 million units during the same period.

27.    According to a Music Trades report published in 2008, the music industry had gross margin of 30% versus approximately 22% gross margins for consumer electronics.  Despite the large gross margins, the industry has been consolidating rather than attracting new entrants.  Even mass market retailers have decided not to compete with defendants herein on the same scale and scope.

28.    Confirming the barriers to entry into the music product retail market, one NAMM member observed (as reported in the March 1, 2008, issue of The Music Trades):  "To generate reasonable sale volume, you need a lot of SKUs.  I am not sure they [Best Buy, then attempting to enter the music retailing market] will be able to achieve the kind of volume they're hoping for in jury 2500 square

feet of space." In a published report in 2008, Morningstar's retail analyst, Brady Lemos, was quoted on the retailing music business as taking "up a lot of real estate." According to Guitar Center's published reports, its average large store selling space is 8,000 - 80,000 square feet, and stocks approximately 4,500 SKUs. By contrast, Best Buy has decided to enter the market in only a very limited way - 91,250 square foot store within a store stocking only approximately 1000 SKUs. Thus, new entrants to the market must make large investments in inventory and retail selling space.

### B.    Guitar Center's Dominance and Power in the Industry

29.    Guitar Center has grown through acquisitions. In June 1999, Guitar Center bought "Musicians Friend", a leading catalogue and instrument retailer with nine retail stores. In April 2001, Guitar Center acquired American Music Group and its 12 retain stores, two mail order catalogues and music accessory distributor. In 2002, Guitar Center acquired M&M Music and Southwestern retailer of musical instruments to schools. In mid 2005, Guitar Center bought Music & Arts Center and its 80 locations. In 2006, Guitar Center acquired four Hermes Music stores in Texas. In February 2007, Guitar Center acquired the Woodwind and The Brasswind out of bankruptcy. As of the end of 2008, Guitar Center's annual sales of $1.55 billion were to the musical instruments annuals sales of $7 billion.

30.    Guitar Center is the only national chain and is viewed as dominant in the retail market with 295 stores and the industry's largest mail order operation

and sales of $2.0 billion, GCI is nearly 5 times the size of its nearest competitor by 2007 according to Music Trades.  From 1997 to 2007, its market share has grown from 6.1% to 26.6%.

31.   Guitar Center dwarfs its next largest competitor.  Sam Ash Musical Corporation is the number two musical instrument retailer in the United States, and operates 45 stores in California, New York, and Texas, and nine other states.  In 2002, Sam Ash acquired the top nine stores of the Mars Music Chain.

32.   According to independent retailers, Guitar Center wields enormous power in the industry.  In an interview in Musical Merchandise Review, April 2007, issue, Alan Levin of Chuck Levin's Washington Music Center, said:

> The biggest concern in Guitar Center.  They are many manufacturers'
> biggest customers and changes are being made. . . to suit them alone."

33.   One NAMM member observed (as reported in the March 1, 2008, issue of Music Trades) "Guitar Center has too much leverage. . ."

34.   Guitar Center, is, according to its own publicly filed financial reports in 2007, the largest customer of many of its suppliers, and thus, each manufacturer depends on GCI for substantial portion of its sales of guitars, and in Fender's case, for a large share of its profits.

35.   The musical instrument product market is characterized by significant barriers to entry which enhanced Guitar Center's dominance and influence and allowed defendants to exercise and maintain control over prices of fretted instruments.

36.    The retail value of entire U.S. market for music and audio products in 2008, as estimated by the Music Industry Census conducted by Music Trades, was $7.1 billion.

37.    In 2008, according to Musical Merchandise Review issue of July 2008, 171 outlets selling fretted instruments closed.

C.    **During the Class Period, NAMM was the Industry's Vehicle to Control Prices in the United States Fretted Instrument Product Market**

38.    Most U.S. manufacturers, distributors, and dealers of musical instruments are members of NAMM.  As the FTC observed in its March 4, 2009, press release entitled *National Association of Music Merchants Settles FTC Charges of Illegally Restraining Competition*, "NAMM serves the economic interests of its members by, among other things, promoting consumer demand for musical instruments, lobbying the government, offering seminars, and organizing trade shows.  In the United States, NAMM sponsors two major trade shows each year, where manufacturers introduce new products and meet with dealers and competing manufacturers, distributors, and retailers of musical instruments meet and discuss issues of concern to the industry."

*See*, http://www.ftc.gov/opa/2009/03/namm.shtm.

39.    Between 2005 and 2007, NAMM organized various meetings and programs for its members at which competing retailers of musical instruments were permitted and encouraged to exchange information and discuss strategies for

implementing minimum advertised price policies, the restriction of retail price competition, and the need for higher retail prices.

40.  Representatives of NAMM determined the scope of information exchanged and discussion by selecting moderator and setting the agenda for these programs.

41.  At these NAMM-sponsored events, NAMM members discussed the adoption, implementation, and enforcement of minimum advertised price policies; the details and workings of such policies; appropriate and optimal retail price and margins; and other competitively sensitive issues.

42.  According to the FTC's complaint, "at meetings and programs sponsored by NAMM, competing retailers of musical instruments and other NAMM discussed strategies for raising retail prices and exchanged information on competitively sensitive subjects such as - prices, margins, minimum advertised price policies, and their enforcement."

43.  According to the FTC, similar discussions were held among manufacturers.

44.  NAMM shows are considered an indispensable resource by music product retailers.  In a February 2007, interview, a member was quoted in Musical Merchandise Review:

> Many years ago, the importance of attending a NAMM show may not have seemed important, today it is absolutely necessary.  Owners and key personnel  should be at NAMM. . . the education seminars are priceless.   The interaction with the industry people and colleagues is also priceless.

45.     The conduct of the defendants was the cause of supra competitive price levels for products in the Fretted Instrument Product market.   Music Merchandise Review, issue date October 2008, reported that Anthem Music Group's head, K. Kilkenny, observed "over the past several years, instrument prices seem to be increasing at a greater rate than that of inflation . . ."   According to The Music Trades "Annual Census of The Music Industries" published in 2009, in 2006, the average price of guitar was $309, by 2007, the average price was $350, and by 2008, the average price was $372.   Thus, the defendants were able to increase aggregate sales despite a 10% decline in unit sales.

46.     The FTC has alleged that no significant pro-competitive benefit was derived from the challenged conduct.   After analyzing the type of information involved, the level of detail, the absence of procedural safeguards, and overall market conditions, the FTC concluded that the exchange of information engineered by NAMM lacked a pro-competitive justification.

47.     The FTC has ordered NAMM to cease and desist from:

(a)     Entering into, adhering to, enforcing, urging, encouraging, advocating, suggesting, assisting, or otherwise facilitating and Musical Product Manufacturer or Musical Product Dealer to enter into, adhere to, or enforce any combination, conspiracy, agreement, or understanding between or among any Musical

Product Manufacturers or Musical Product Dealers relating to:

(i)    the retail price of any Musical Product;

(ii)    any term, condition, or requirement upon which any Musical Product Manufacturer or Musical Product Dealer deals, or is willing to deal, with any other Musical Product Manufacturer or Musical Product Dealer, including, but not limited to, Price Terms, margins, profits, or pricing policies, including, but not limited to Minimum Advertised Price Policies or Resale Price Maintenance Policies; or

(iii)    the refusal to do business, or the reduction of business, with particular Musical Product Manufacturers or Musical Product Dealers.

(b)    urging, encouraging, advocating, suggesting, coordinating, participating in, or facilitating in any manner the exchange of information between or among Musical Product Manufacturers or Musical Product Dealers relating to:

(i)    the retail price of Musical Products; or

(ii)    any term, condition, or requirement upon which any Musical Product Manufacturer or Musical Product Dealer deals, or is willing to deal, with

any other Musical Product Manufacturer or Musical Product Dealer, including, but not limited to, Price Terms, margins, profits, or pricing policies, including, but not limited to, Minimum Advertised Price Policies or Resale Price Maintenance Policies.

**D.** **Anticompetitive Effects of Defedants' Unlawful Conduct**

48. The MAP policies imposed and enforced by defendants here went well beyond typical cooperative advertising programs where manufacturers place restraints on the prices dealers may advertise in advertisements funded in whole, or in part, by the manufacturer.

49. The MAP policies inflicted on musical retailers by NAMM and manufacturers are anti-competitive. According to a Wall Street Journal Report dated October 23, 2008, Bradley Reed, sales manager for Musician's Advocate, Inc., said "it [his company] had very little choice but to honor manufacturer's policies on advertised prices because otherwise it risks having its supplies cut off or being delisted as an authorized distributor."

50. Defendants' practices have had the following anti-competitive effects, among others, in the relevant market:

(a) Competition in the relevant market has been unreasonable restrained, suppressed, and in some cases, destroyed;

(b)     Potential competitors have been restrained from entering into the relevant market and have been prevented from competing effectively against defendants;

(c)     Purchasers of musical instruments have been denied the benefits of competition in a free and open market and have been forced to pay artificially high instrument prices;

(d)     Upon information and belief, defendants have enjoyed, and will continue to enjoy, ultra competitive profits to the detriment of competitors and purchasers of musical instruments.

51.     The aforementioned anti-competitive effects of defendants conduct on competition in the relevant market outweigh any conceivable pro-competitive benefits.

### E.     Market Power

52.     As of those claims for which proof of market power is required (*i.e.*, those for which the rule of "per se" illegality does not apply), the relevant product market in this case is retail sales of products in the fretted instruments product category which includes guitars, amplifiers, and accessories for same.

53.     The relevant geographic market in this case is the United States of America.

54.    As small but significant non-transitory price increase in fretted instrument product category would not result in a loss of sale within this producet market to sales in other music product categories.

55.    By virtue of their power to control prices and exclude competition in the relevant market(s), defendants', at all relevant times, possessed market power in the relevant market(s).  Moreover, at all relevant times, defendants possessed dominant shares of the market(s) for retail sales of musical instruments, generally fretted instruments in particular.

56.    Likewise, defendants, at all relevant times, possessed substantial market power in the market(s) for its products, due, in part, to the high level of product differentiation in the industry.  Specifically, defendants: (a) sold their musical instruments at prices substantially in excess of marginal costs, (b) enjoyed high profit margins thereon, (c) sold such products substantially in excess of the competitive price, and (d) enjoyed substantial barriers to market entry and growth.

57.    Defendants exchanged competitively sensitive information that had the purpose, tendency, and capacity to facilitate price coordination among competitors.

58.    There is substantial concentration among the firms that manufacture the products in the relevant market(s).

59.    Defendants together imposed and enforced minimum retail price maintenance and minimum advertised price policies which were contrary to

manufacturers' economic interests because each manufacturer rational economic goal was to increase sales volume rather than terminate retailers.

**F.    Market Effects of Defendants' Conduct**

60.    The overall effect of defendant's anti-competitive, exclusive scheme has been to substantially foreclose and impair competition (and the threat of such competition) from lower-priced musical instruments. As alleged above, had defendants not improperly foreclosed or stifled actual or potential competitors from competing in markets for the musical instruments, other actual or potential rival manufacturers would have achieved much greater sales than they actually did (or threatened to do), given the cheaper prices that they charged (or could have charged upon entry), and would have posed a far great competitive threat to defendants.    Additionally, absent defendants exclusionary conduct, barriers to entry of the markets would have been lower, which: (a) would have made it easier for existing or new competitors to enter or expand their positions in the market for the musical instruments, and (b) would have caused existing or potential competitors to be attracted to the musical instrument market because of the supra-competitive prices that defendants was charging.  As a result, absent defendants' misconduct, defendants would have rationally perceived that there was a greater threat of potential competition in each of the relevant markets if defendants did not reduce its supra-competitive prices.

61.    The presence of unfettered competition from actual or potential competitors, which were selling lower-priced musical instruments, would have

forced defendants to lower the prices for its musical instruments in order to remain competitive and/or to counter a perceived threat of additional entry.

62.    As a result of defendants' conduct, independent retailers could not compete with nationwide and/or multi-regional claims because the retailers could not price-compete.  Accordingly, retailers such as Guitar Center were able to raise prices above and beyond what they would be under competitive conditions.

63.    During the relevant period, plaintiff and the other members of the Class purchased musical instruments directly from defendants.  As a result of defendants alleged illegal conduct, members of the Class were compelled to pay, and did pay, artificially inflated prices for the musical instruments they purchased. Plaintiff would have been able to, *inter alia*, purchase less expensive musical instruments had potential competitors been able to engage in unfettered competition.  The prices that Plaintiff and the other Class members paid for musical instruments during the Class Period were substantially greater than the prices that Plaintiff and the Class members would have paid absent the illegal conduct alleged herein because: (a) the prices of all musical instruments were artificially inflated by defendants illegal conduct; and (2) Class members were deprived of the opportunity to purchase musical instruments at substantially lower prices.  Thus, Plaintiff and the Class have, as a consequence, sustained substantial damages in the form of overcharges.

## CLASS ACTION ALLEGATIONS

64.    Plaintiff brings this action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All individuals and persons who purchased one or more Fretted Instrument Products from any of the defendants from January 1, 1999, through December, 2007 ("Class Period")

Excluded from the Class are the defendants, their co-conspirators, their respective parents, subsidiaries and affiliates, any judge or magistrate presiding over this action and members of their families, as well as any governmental entities.

65.    Plaintiff does not know the exact size of the Class since such information is exclusively in the control of defendants.  Plaintiff believes that there are thousands of Class members, and that they are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all Class members is impracticable.

66.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all Class members were damaged by the same wrongful conduct of defendants and their co-conspirators as alleged in this Complaint.

67.    Plaintiff will fairly and adequately protect the interests of the Class. The interests of Plaintiff coincide with and are not antagonistic to, those of the Class.  In addition, Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex class action and antitrust litigation.

68.    There are questions of law and fact common to the members of the Class, and those common questions predominate over any questions which may affect only individual members of the Class, because defendants have acted on grounds generally applicable to the entire class.  Among the predominant questions of law and fact common to the Class are:

(a)    Whether defendants conspired and/or engaged in concerted action or unilateral action in restraint of trade;

(b)    Whether defendants intentionally and unlawfully engaged in a scheme to control price and potential competitors from the relevant market;

(c)    Whether defendants' unlawful conduct caused Plaintiff and the Class members to pay more for Fretted Instrument Products than they otherwise would have paid;

(d)    The duration and extent of the combination or conspiracy alleged herein;

(e)    Whether defendants and their co-conspirators were participants in the combination or conspiracy alleged herein;

(f)    Whether the alleged combination or conspiracy violated Section 1 of the Sherman Act;

(g)    The effect of the combination or conspiracy upon the prices of Fretted Instrument Products sold in the United States during the Class Period;

(h)    Whether plaintiff and members of the Class are entitled to declaratory, equitable, and/or injunctive relief;

(i)     Whether plaintiff and the Class have been damaged and the appropriate measure of such damages;

(j)     Whether defendants engaged in agreements, contracts, combinations, and conspiracies which had the purpose and/or effect of unreasonably restraining competition and limiting purchasers' access to competing and lower priced Fretted Instrument Products; and

(g)     Whether defendants unreasonably anti-competitive contracts, contribution, and conspiracies have caused plaintiff and other class members to suffer injury to their business or property.

69.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.   The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.   There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as a class action and no superior alternative exists for the fair and efficient adjudication of this controversy on behalf of plaintiff and the members of the Class.

## FIRST CLAIM FOR RELIEF

### (Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1)

70.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

71.    Beginning in approximately 1999, the exact date being unknown to plaintiff and exclusively within the knowledge of defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

72.    In particular, defendants combined and conspired to raise, fix, maintain, or stabilize the prices of Fretted Instrument Products sold in the United States.

73.    As a result of defendants' unlawful conduct, prices for Fretted Instrument Products were raised, fixed, maintained, and stabilized in the United States.

74.    The contract, combination, or conspiracy among defendants consisted of a continuing agreement, understanding, and/or concerted action among defendants and their co-conspirators.

75.    For purposes of formulating and effectuating their contract, combination or conspiracy, defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including, but not limited to:

(a)     participating in meetings and conversations to discuss the prices and supply of Fretted Instrument Products;

(b)     communicating in writing and orally to fix target prices, floor prices, and price margins for Fretted Instrument Products;

(c)     exchanging competitively sensitive information among each other to facilitate their conspiracy, including minimum advertised pricing, strategies for retail  prices, restricting retail price competition;

(d)     agreeing to manipulate prices and supply of Fretted Instrument Products sold in the United States in a manner that deprived direct purchasers of free and open competition; and

(e)     selling Fretted Instrument Products to customers in the United States at noncompetitive prices.

76.    As a result of defendant's unlawful conduct, plaintiff and the other members of the Class were injured in their businesses and/or property in that they paid more for Fretted Instrument Products than they otherwise would have paid in the absence of defendants' unlawful conduct.

<u>SECOND CLAIM FOR RELIEF</u>

**(Against All Defendants for Violations of 15 U.S.C. § 1-**

**Agreements Restricting Trade)**

77.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

78.    Defendants through their actions described above constituting agreements,

and their enforcement, contracts, combinations and conspiracies that substantially, unreasonably, and unduly restrain trade in the relevant market(s), and harmed Plaintiff and the Class thereby.

79. The relevant product market is Fretted Instrument Products and the relevant geographic market is the United States.

80. The action alleged covers a sufficiently substantial percentage of the relevant market(s) to harm competition.

81. The actions of the defendants directly and/or through NAMM constitute concerted action.

82. NAMM is *per se* is liable for the creation, maintenance, and enforcement of the agreements under a "quick look" and/or rule of reasonable standard

83. Alternatively, NAMM is liable for the created, maintenance, and enforcement of the agreements under a "quick look" and/or rule of reason standard.

84. There is no legitimate, pro-competitive business justification for defendants' conduct, or any of them, that outweighs their harmful effect.

85. Plaintiff and members fo the Class were injured in their business or property  by the collusion and conspiracy alleged above with facilitates, enabled, and assisted or further defendants' substantial foreclosure and exclusion of competition in the relevant markets.  Without limiting the generally of the foregoing, plaintiff and the other members of the Class have been forced to pay higher prices for musical instruments that they would have paid in the absence of defendants' unlawful conduct.

## THIRD CLAIM FOR RELIEF

**(Against Defendants Namm and Guitar Center for Violation of the Sherman**

**Antitrust Act,  U.S.C. § 2-Attempted Monopolization)**

86.     As a direct and proximate result of Guitar Center's monopolistic

conduct, competition in the relevant market has been unreasonably restricted and injured,

and plaintiff and the members of the Class have paid supra competitive prices for musical

instruments.  As a result of the defendant's unlawful conduct, plaintiff and members of

the Class have suffered and will continue to suffer damages.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, plaintiff prays that:

A.     The Court determines that this action may be maintained as a class action

pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure with respect to

the claims for damage, and declaring plaintiff as the representative of the Class and his

counsel as counsel for the Class;

B.     The Court declares the conduct alleged herein to be unlawful in violation

of the federal antitrust laws and the common law of unjust enrichment;

C.     Plaintiff and each member of the Class recover punitive and treble

damages to the extent such are provided by the law;

D.     Plaintiff and each member of the Class recover the amounts by which the

defendants have been unjustly enriched in accordance with states law;

E.     Defendants be enjoined from continuing the illegal activities alleged

herein;

F.     Plaintiff and the Class recover their costs of suit, including reasonable

attorneys' fees and expenses as provided by law; and

G.      Plaintiff and the Class be granted such other, further, and different relief

an the nature of the case may require or as may be determined to be just, equitable and

proper by this Court.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.


Respectfully submitted,

Dated: October 30, 2009


 s/ Eric D. Holland
Eric D. Holland MO Bar #39935
Steven J. Stolze
HOLLAND, GROVES,
SCHNELLER & STOLZE, LLC.
300 N. Tucker, Suite 801
St. Louis, MO 63101
314-241-8111
314-241-5554 Facsimile
Email: eholland@allfela.com
Email: stevenstolze@sbcglobal.net

Gilbert T. Adams, III
State Bar No. 00790201
LAW OFFICES OF GILBERT T. ADAMS
1855 Calder Ave.
Beaumont, Texas 77701
Phone: 409-835-3000
Facsimile: 409-832-6162
Email:   gilbert@gta-law.com